COLE, Circuit Judge,
concurring.
I fully concur in the lead opinion. I write separately to note that I would also affirm the district court’s denial of Bush’s Rule 50(b) motion under law-of-the-ease principles. Because Bush can point to no way in which the facts confronting us now differ from those facing us when we denied him summary judgment and qualified immunity, see Smoak v. Hall, 460 F.3d 768 (6th Cir.2006) (“Smoak I ”), I would draw the same conclusions of law from those facts as the Smoak I panel did. See Moses v. Bus. Card Express, Inc., 929 F.2d 1131, 1137 (6th Cir.1991) (“ ‘[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.’ ” (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983))); see also 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478.2 (2009) (“Deference to an earlier panel ruling is properly deepened because the decision typically involves the concurrent judgment of two or more judges.... [F]ree reexamination would encourage multiple appeals, undertaken in the sole hope that a second panel will accept arguments that failed to persuade the first.”).
When this case was previously before this Court, we denied summary judgment to Bush on Smoak’s excessive force claim based on the following reasoning:
In many of the cases involving excessive force, the plaintiffs resistance is what triggered the use of force from the *142 officers. See, e.g., Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir.2002) (holding that the officers’ use of force to handcuff a suspect was necessary because the suspect “acknowledged that he ‘twisted and turned some’ when they tried to handcuff him and that the officers had difficulty restraining him”); Darrah [v. City of Oak Park], 255 F.3d [301] at 307 [(6th Cir.2001)] (upholding an officer’s use of force because “Officer Bragg and the other members of his arrest team were in the middle of a boisterous and unruly group of picketers attempting to make an arrest of an individual who was resisting their efforts”); see also Tapp v. Banks, 1 Fed.Appx. 344, 350 (6th Cir.2001) (unpublished) (holding that “it is not objectively reasonable for an officer dealing with an essentially compliant person, to strike the person’s legs twelve to fifteen times in the absence of resistance”).
James [Smoak], in contrast, was initially compliant with the police officers’ demands, and he jumped up only after his dog had been shot right in front of him. Given that James was handcuffed, a reasonable officer would not have “knocked his legs out from under him, and [thrown] him to the pavement face-first.” James alleges that he suffered physical injuries that required both admission to a hospital and subsequent surgery. A jury could find that a reasonable officer would not have reacted this forcefully to a handcuffed man who showed no signs of noncompliance until his pet was killed in front of his family.
The THP troopers argue, however, that James’ allegations are unambiguously controverted by the videotape taken of the incident. This argument fails because the video does not so clearly undermine James’s claim as to permit us to ignore our charge to accept all of the Smoaks’ allegations as true. See Turner [v. Scott], 119 F.3d [425,] 428 [ (6th Cir.1997) ] (holding that defendants may collaterally appeal the denial of qualified immunity only when the facts are uncontested). Although the video does not appear to show any swiping of James’s legs, his head twice gets very close to the ground before going out of the camera’s range, which is consistent with his allegations.
Based on the facts as alleged by the Smoaks, James was handcuffed, generally compliant, and obviously reacting in horror to the shooting of his dog. The law is clearly established that, in this situation, tackling James in the manner he alleges would not have been a reasonable way to restrain him. Cf. Burchett, 310 F.3d at 944 (permitting officers to tackle a suspect who was resisting arrest). We therefore affirm the district court’s denial of qualified immunity to Andrews and Bush on this one aspect of the Smoaks’ excessive-force claim. This is not to say that a jury hearing all of the evidence will ultimately agree with James’s version of the facts, but we are unable to hold as a matter of law that his version is not worthy of belief.
Smoak I, 460 F.3d at 783-84 (emphasis added). Following a trial, a jury found that Trooper Bush had used excessive force.
In his current appeal, Bush points to four specific ways in which he claims the evidence adduced at trial repudiated the facts presumed true by the Smoak I panel, such that no reasonable jury could have believed them. In reviewing a Rule 50 motion, we view the evidence “in the light most favorable to the party against whom the motion is made.” K & T Enters., Inc. v. Zurich Ins. Co., 97 F.3d 171, 176 (6th Cir.1996). Viewed in this light, none of the four asserted instances of “new” evidence renders the set of facts before us *143 different from that assumed by the Smoak I court.
First, Bush asserts that the trial testimony established that when Smoak jumped up at the sound of the gunshot, he moved toward the officer who had fired the shot, justifying Bush in restraining Smoak by pulling him back by the handcuffs. Bush claims that this evidence differs from the deposition testimony on which the Smoak I court relied. However, the Smoak I court viewed the video of the event, so it was aware of the extent to which Smoak was moving toward the firing officer when he jumped up. In addition, based on the video evidence and the testimony, the jury could have believed that Smoak did not make a definitive or pronounced movement toward the officer firing the shot. (E.g. Smoak Tr. 61 (“It seems that my body moves over [in the video] — I don’t know if I actually stepped [i.e., took a step toward the officer].”).) Moreover, the Smoak I opinion did not purport to rely on the fact that Smoak did not move in the direction of the officer who fired the shot. Therefore, this “discrepancy” in the evidence does not alter the Smoak I court’s analysis.
The second way Bush claims the testimony at trial differed is that Smoak admitted at trial that when he jumped up upon hearing the gunshot, he did so in violation of the officers’ instructions to remain on his knees. However, the Smoak I court assumed that Smoak was violating instructions when he jumped up, noting that Smoak was “initially compliant” and “showed no signs of noncompliance until his pet was killed.” Smoak I, 460 F.3d at 783 (emphasis added). Judge Cook made the same argument Bush now makes in her dissent in Smoak I, and the majority implicitly rejected it. Id. at 786-87 (Cook, J., dissenting) (noting that Smoak “jumped to his feet ... despite being ordered to remain in the kneeling position”). Therefore, this purportedly new testimony does not change the Smoak I court’s analysis.
The third and fourth ways Bush claims the trial testimony differed from Smoak’s previous allegations to the Smoak I court relate to the manner in which Smoak was brought to the ground. The Smoak I panel assumed the truth of Smoak’s allegation that Bush “knocked his legs out from under him, and [threw] him to the pavement face-first.” Smoak I, 460 F.3d at 783. The panel further stated, “[although the video does not appear to show any swiping of James’s legs, his head twice gets very close to the ground before going out of the camera’s range, which is consistent with his allegations.” Id. at 784. Bush argues that the trial testimony showed that the tackling of Smoak did not involve any swiping of the legs, and that it was Andrews, not Bush, who pushed Smoak’s face to the ground. However, Smoak did testify, as he had in the deposition testimony considered by the Smoak I court, that Bush forced him face-down onto the ground. Describing to the jury what was happening in the video, Smoak testified: “[h]e has swept my legs out from under me, so I’m headed down now ... I’m getting ready to hit my knee — my head is a little higher than my knees, but it’s still — when you are cuffed with your hands behind your back, you hardly have any choice once you’re in that position. It’s knees or head.” (Smoak Tr. 25.) This suggests, and the jury reasonably concluded, that Bush forced or threw Smoak to the ground face-first, even if it was Andrews who allegedly proceeded to “put[ ] [Smoak’s] face in the pavement.” (Smoak Tr. 25.)
At bottom, this appeal is a renewal of Bush’s argument that his actions, as shown on the video, did not amount to excessive force because he was making a split-sec *144 ond judgment, dealing with a non-compliant robbery suspect, and using an objectively reasonable level of force. These are the same arguments Bush made to the Smoak I panel, and that panel rejected them. Bush is not entitled to another bite at the apple. Once it is established that the evidence at trial, viewed in the light most favorable to Smoak, was identical to the evidence presumed true by the Smoak I panel, affirmance is appropriate on the ground that the holding in Smoak I is the law of the case with respect to what conduct may constitute excessive force and what conduct is or is not entitled to qualified immunity.